Number 2730. Mr. Looney. Good morning, Your Honors. I'm Josh Looney of Goulston & Storrs, arguing on behalf of the plaintiff appellant, Phyllis P. Meadows, or Phyllis, to overturn the District Court's grant of summary judgment to the defendant appellees. And with me is my colleague, Christian Habersat, also of Goulston & Storrs. This is a case about the ownership of a standing mobile created by the sculptor Alexander Calder, which I will refer to as the Calder. The issue before the court today is whether the District Court erred in finding that no reasonable jury could conclude from the evidence in the summary judgment record that Phyllis had an ownership interest in the Calder. And there was evidence in the summary judgment record showing that Phyllis held a joint ownership interest in the Calder with her brother, Paul. First, the provenance listed in sales and purchase invoices and in defendant's email correspondence shows both Phyllis and Paul as joint owners of the Calder. Second, Phyllis's verified complaint in which she testified under oath that she had a joint ownership interest in the Calder with her brother, Paul, at the time of sale of the Calder to the defendants. And third, there are excerpts from Phyllis's deposition testimony in the summary judgment record reflecting that she jointly owned the Calder with Paul. Now, the District Court made three errors when it concluded that there was insufficient evidence of Phyllis's ownership. First, it did not consider the possibility that the Calder could have been jointly distributed out of Phyllis and her brother Paul's stepmother's Jane's estate to both Phyllis and Paul. Second, the District Court misconstrued the provenance of the Calder. And third, it did not address other evidence, namely Phyllis's verified complaint and her deposition testimony that was in the record. So, you say that the District Court didn't take account of the possibility that the Calder could have been jointly distributed. Is it your position that it was jointly distributed? Yes, Your Honor. That is our position. So, when was it distributed to Phyllis? So, Your Honor, we know from the facts that the District Court found below that Jane Meador's estate was fully distributed by July of 2002. This means that the Calder would have been distributed at that point in time. As we have the Calder's provenance in 2016 showing that Phyllis and Paul were joint owners of the Calder, therefore, we can assume that it was jointly distributed in both Phyllis and Paul. I mean, wouldn't she have received it? Wouldn't there be some kind of documentation? I mean, she is the one you're saying received the distribution. So, it seems odd to sort of reconstruct it indirectly when she could just say, oh, on this day, Paul, as the executor, distributed the Calder to me. I mean, you don't have such evidence, right? Your Honor, we don't necessarily have the exact date, but we do have sworn testimony from Phyllis that she and her brother both received a joint ownership interest in the Calder. And we do have the provenance, which, as the Second Circuit has found… But doesn't the provenance also say that Paul is the rightful owner and has full authority to sell it? I mean, right there next to the statement about them both having an ownership interest, it also says that he has the sole right and full ownership and ability to sell it, doesn't it? So, why do we discount one part of the provenance but not the other part? Your Honor, first, that is not the only incident of the provenance. The provenance is listed in multiple pieces of evidence in the record before the court, not only in that invoice, but also in the sales invoice that the defendants used when they sold the Calder overseas to a gallery in Switzerland. And also, an email correspondence where it's shown that the Calder Foundation, where the Calder was registered, listed the same provenance. It's also confirmed by the defendant in an email to Christie's Auction House that that provenance was the same. In each of these iterations of the provenance, there's not that conflicting point about the invoice of that he had full authority to sell in that one point. Therefore, the provenance itself is consistent across all different pieces of evidence in the record. This is Judge Park. Isn't your client's real issue with Paul for a breach of some state law, judiciary duty, or something like that? It just seems like this suit, as we look at it, is kind of a mismatch for what you were complaining about. Respectfully, Your Honor, the suit is against the defendants, the defendant Art Gallery and defendant Antoine Helwasser, because as art merchants, they had a higher duty to investigate the ownership of the Calder. However, Your Honor, that is not the issue on appeal. The issue at this point is whether or not she had an ownership interest in the Calder at the time of sale. Just going back to the provenance for a second. So when Helwasser sold it again, didn't they generate a provenance that doesn't mention Phyllis at all? No, Your Honor. The provenance that the article of sale was overseas lists Paul and Phyllis as the joint owners. And in fact, Your Honor, there's only one provenance in the whole evidentiary record which only lists Paul. But this was on the invoice that the defendants did not use when they purchased the Calder. But anyway, I mean, doesn't this go to what the district court found, which is that the provenance is something that is generated at a point of sale, and it doesn't have rigorous standards for documenting ownership. It just shows the path of the piece of art through different hands, but it doesn't actually document ownership. Respectfully, Your Honor, the provenance has been found, one, by this circuit in Deworth v. Baldinger to be a history of ownership, which is an indicia of evidence that we are saying that she had an ownership interest in the Calder. And it's also found in New York State courts that provenance is our history of ownership. And moreover, Defendant Antoine Hawasser himself, in his deposition testimony in the record, testified that a provenance is a significant piece of evidence in determining an artwork's ownership. You have one minute left. Thank you. I would return back to also the point that the district court misconstrued the provenance by assuming that it merely reflected Phyllis' beneficial interest in the artwork. This is a twofold error. First, it doesn't make sense from the fact that the Calder was distributed in 2002, after which point the beneficial interest would have merged completely with full legal title after that point, to then say that at 2016 at the time of sale, the provenance still just showed beneficial ownership. And second, if that had been the case, the provenance would have shown an owner entry after Phyllis and Paul's entry at that point. And thank you, Your Honor. Thank you, Counsel. We'll hear next from the appellee, Mr. Grossman. Thank you, Your Honor. Judd Grossman for appellee. I'd like to start where my friend on the other side left off, and that's the significance of provenance. We don't dispute, we entirely agree that provenance is significant. Provenance is the history of ownership of a work of art. What we're talking about here, though, is a description, a description of provenance by someone years later, and that is not proof of ownership at all. And Judge Castell properly held that especially when put in context with the brother's statements that he was the undisputed owner of the work, at best, that description of provenance reflects the sister's beneficial interest and nothing more. The appellant came to the court on a theory that she had acquired an ownership interest under the will. She disavowed that theory and now expressly concedes that the artwork did not pass directly under her stepmother's will at the time of her stepmother's death. And, of course, that's because the will says no such thing. And, therefore, to the extent an appellant wants this court to rely on her verified statement from her complaint or excerpts from a deposition where, by the way, the quoted language was from the question, not the answer, but from the question, there's no probative value at all to those statements. They're simply legal conclusions not backed by any evidence in the record. Your Honor. Well, I mean, it is some evidence. So on summary judgment, we have to draw inferences in favor of the non-moving party. Right. So from all of these accounts of the provenance and from the testimony and the various emails about Phyllis wanting Paul to share the calder with her. Why isn't it a possible inference that she owned it or had an ownership interest in it? I think, as was pretty clear from my friend's presentation, they can't put in a shred of evidence explaining the circumstances of that purported distribution, which, once again, was not what they argued initially. They can't say when, how or under what circumstances that purported distribution took place. They can't even cite, as Judge Costell held, a single conversation with the brother, which may have led her to believe, putting aside whether there was legal significance, even led her to believe that she was the joint owner. The whole basis of their belief that she was a joint owner originally derived from the will. And once that will was produced in litigation, they had to reverse engineer a theory to try and fit the legal requirements. To the extent they're relying on provenance statements that the defendants provided to Christie's, and this is in the appendix at JA 132. I think this is a perfect illustration of why the description of provenance has no probative value is because it's wrong. It says in the document they're relying on that the defendants acquired the work from the father. Nobody makes that allegation here at all. First Department in the anonymous case, which we cite at page 16 of our papers, makes very clear that that's the reason why an invoice without more may not be regarded as evidence of title or ownership. The court there said there's always the potential for unreliability of information contained in an invoice. And that's why without more, and we have nothing more here without more, it can't be relied on. The appellant was and is free to pursue her claims against her brother for failing to remit what she claims are her share of the proceeds. But as far as title to the artwork is concerned, she's furnished absolutely no admissible evidence creating any triable issue of fact. Do you have a view on who had title to the artwork? At the time of sale? Well, two answers. Did they recall the owner of it? Yeah, two answers to that question. The first is, yes, that was Hellwasser's understanding. And this is in the record at his deposition, which they cite at J137, that based on Paul's expressed unambiguous statements that he was a sole title holder. That was Hellwasser's belief. But I think more importantly, for present purposes, where the brother was the sole owner and there's no proof otherwise, Hellwasser's understanding is entirely irrelevant. And Judge Furman articulates that point quite clearly in his decision in Galland v. Hamada, which we cite at page eight. If, in fact, the transferor had good title, the buyer's understanding or belief or good faith is totally irrelevant. The cases that the other side relies on relate to a very narrow entrustment doctrine under the UCC. But in a situation like this where there's absolutely no evidence that the brother did not have sole ownership, Hellwasser's views are totally irrelevant. Yeah, but so it seems like the evidence on which you're relying for the view that Paul had sole ownership is his unambiguous statement that he had sole ownership. So if we have her statements that she's an owner and his statements that he's an owner, why isn't that a question that can be submitted to a jury? Sure, because the burden's on the plaintiff to put forward admissible evidence. And that's her statement, which is a legal conclusion backed by no evidence that she's the sole owner, is absolutely not evidence admissible to prove her ownership. We highlight the statement in the brother's invoice issued to Hellwasser to illustrate that the provenance description couldn't mean what plaintiff wanted to say. But under no circumstances have they satisfied their burden of putting in admissible evidence that anyone other than the brother was the title owner. And I should point out, there is no dispute, although this was briefed below, that as the executor of the estate, as the executor of the estate, of course, the brother took unqualified legal title to the work. And absent any proof by the plaintiff that he transferred title or a portion of title to her, her replevin claim is out of court, as Judge Castell held. As Judge Park pointed out, this is a mismatch. The case should have been brought against the brother, not against the gallery. And for these reasons, summary judgment should be reaffirmed. Thank you. Thank you, counsel. Mr. Looney, you've reserved two minutes for rebuttal. Yes, your honor. I think I'd like to point out two things. First, that my brother from the other side insists that there is no admissible evidence that Phyllis had joint ownership interests. This, quite frankly, isn't true, as expressed in our reply brief. Her verified complaint is admissible evidence. The point that. My brother insists that. The way the color passed under the will. Is a red herring. It doesn't disqualify the entire verified complaint, which is very clear that when Paul matters took possession of the Calder, both he and the plaintiff held a joint ownership interest in the Calder. Second, your honor, I would point out that the invoices that my brother from the other side disputes indeed goes with showing that this is actually a question of fact about whether or not she had an ownership interest in the Calder. The invoices, some of which were prepared by Antoine Hellwasser, such as J.A. 135, show clearly that Phyllis and Paul were joint owners of this piece of art. The fact that they point to a mistake in one provenance about where it came from doesn't dismiss the fact that both Phyllis and Paul are listed jointly on every provenance in the record. Importantly, in the provenance listed on J.A. 128, where from the Calder Foundation, it shows that Paul matters and Phyllis matters for joint owners of the Calder. This is admissible evidence, and it does show that a reasonable jury could conclude from these pieces of evidence that Phyllis had a joint ownership interest in the Calder at the time of sale, and that it existed after the sale as well. I mean, if Phyllis can't even speak to when exactly the piece was distributed to her or when she took ownership of it, why is it that Antoine Hellwasser or the Calder Foundation would have better knowledge of when title was transferred? Your Honor, it shows that, one, this is something that they have adopted as they believe is true, that this has been the recognized path of ownership for the Calder, and also, Your Honor, I would point out that at this summary judgment stage, we don't need to prove exactly how the Calder was distributed or what specific date. What we have to do is show that there's evidence from which a reasonable jury could conclude, drawing inferences in Phyllis' favor, that this evidence shows that she did have a joint ownership interest in the Calder. And with that, Your Honors, I would rest the remaining of my argument time upon our briefing before the Court. Thank you both. We'll take the case under advisement.